UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**GORDON D. SONDLAND,**
1521 2nd Avenue # 1603
Seattle, WA 98101

       Plaintiff

v.

**MICHAEL R. POMPEO**, **individually,**         Case No. 1:21-cv-01405_
26794 Barnsley Place
Chantilly, VA 20152

and

**THE UNITED STATES OF AMERICA**,

Serve: c/o Merrick J. Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 205330-0001

       Defendants

## COMPLAINT

### I.     INTRODUCTION

Plaintiff GORDON D. SONDLAND, by his counsel, Miller Barondess, LLP, respectfully files this Complaint against Defendant MICHAEL R. POMPEO in his personal and individual capacity for intentional misrepresentation, negligent misrepresentation, and breach of warranty of authority and, in the alternative, against Defendant THE UNITED STATES OF AMERICA, and as ground therefor states as follows:

1.     Plaintiff ("Sondland" or "Ambassador Sondland"), a former United States Ambassador to the European Union, seeks to hold the former Secretary of State Michael R.

Pompeo ("Pompeo") and the United States Government ("Government")—acting through Pompeo—to their legally binding obligations.

2.      At all times pertinent hereto, Pompeo represented that he possessed the authority to bind the Government to an agreement whereby the Government, through the United States Department of State ("Department of State" or "State Department"), would reimburse Plaintiff for all of his attorneys' fees and costs in connection with complying with Congressional subpoenas. Specifically, in 2019, Ambassador Sondland was subpoenaed to testify before the United States Congress in his capacity as a State Department employee and advised that attorneys from the Government had been declared unavailable to advise or represent Ambassador Sondland. Accordingly, Pompeo made a legally binding promise, both individually and on behalf of the Government, to reimburse Plaintiff's attorneys' fees and costs.

3.      The events at issue began in September 2019, when the House Foreign Affairs and Intelligence and Oversight Committees in charge of the impeachment inquiry against former President Donald J. Trump made their first of several demands that Ambassador Sondland testify. Despite the fact that Ambassador Sondland was subpoenaed in his capacity as an official Government diplomat, Defendants bucked normal convention and denied him the services of any Government counsel.  This act was especially problematic in this instance because the amount of preparation needed to comply with the subpoenas was staggering.  Ambassador Sondland was required to prepare for highly charged testimony under oath with international scrutiny without access to materials or anyone from the Government agencies which had knowledge of all the facts relevant to his testimony.  Ambassador Sondland was forced to create a new team to reconstruct all the materials needed and to prepare for this daunting task.  With only days before a scheduled

closed-door deposition on Capitol Hill, Ambassador Sondland was forced to retain private counsel, and he used the services of private counsel in reliance on Pompeo's promise of reimbursement.

4.      Ambassador Sondland retained a Washington, D.C. law firm well experienced in Congressional investigations that possessed the capacity to assist him, along with his long-time personal counsel, in preparation for his critically important testimony.  Ambassador Sondland continued to rely on Pompeo's individual promise, on behalf of himself and the Government, in seeking outside counsel and incurred nearly $1.8 million in attorneys' fees and costs.

5.      Pompeo assured Ambassador Sondland that the State Department would reimburse him for all of his legal costs; and through the fall of 2019, Pompeo and his staff continued to reaffirm his promise.

6.      Thereafter, in two sessions before the House Foreign Affairs and Intelligence and Oversight Committees on October 17 and November 20, 2019, Ambassador Sondland testified under oath for over seventeen hours—the last seven broadcasted on live national television and elsewhere around the world.

7.      Under intense examination under oath for hours on end, with both political parties using the questioning to score political points, Ambassador Sondland truthfully testified to the best of his ability about his experiences on the front lines of the Government's diplomatic relations with the Ukrainian government.  His testimony addressed the purported "quid pro quo" with the newly elected Ukrainian government leader.  His testimony was highly fraught, highly charged, and highly risky with tremendous consequences.

8.      For all his troubles, Ambassador Sondland learned that testifying truthfully and candidly before Congress as cameras roll was in fact a fireable offense in Pompeo's Department of State.  Plaintiff was terminated on February 7, 2020, simply for telling the truth.

9.    After Pompeo learned what Ambassador Sondland's testimony was before Congress during the 2019 Impeachment Inquiry—words that were entirely candid and truthful (but uncomfortable to the Trump Administration)—Pompeo reneged on his promise.  As a result, the Government has withheld reimbursement of Ambassador Sondland's attorneys' fees and costs in willful breach of the October 2019 agreement between Pompeo, the Government and Ambassador Sondland.

10.    With the contractual commitment of Pompeo having been abandoned apparently for political convenience, Ambassador Sondland turns to this Court to reimburse his attorneys' fees and costs and make him whole.

11.    In the alternative, if Pompeo attempts to assert that he did not possess the authority to bind the Government to reimburse Ambassador Sondland's attorneys' fees, Pompeo was at all times acting for his own self-serving personal or political reasons, to further his interests to protect himself and others.  Thus, in the alternative, Plaintiff seeks to hold Pompeo personally liable for misrepresenting his authority.

12.    If Pompeo did not have the authority to bind the Government, Pompeo went rogue and acted outside the course and scope of his employment and duties, making a promise in his personal capacity that was not the kind of act he was employed to perform, and not motivated by a desire to serve as the leader of the Department of State.  Instead, it was self-serving, made entirely for personal reasons for his own political survival in the hopes that Ambassador Sondland would not implicate him or others by his testimony.

4

## II.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction over the Tucker Act claim in this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, and 28 U.S.C. § 1361 because this suit is brought against an officer of the United States.

14.    This Court has jurisdiction over the state law claims pled in the alternative pursuant to 28 U.S.C. § 1332 because Ambassador Sondland and Pompeo are completely diverse, and the amount in controversy exceeds $75,000.

15.    This Court also has jurisdiction over the state law claims pled in the alternative pursuant to 28 U.S.C. § 1367, because such claims form a part of the same case and controversy with the federal claims.

16.    Venue is proper in this District by operation of 28 U.S.C. § 1391 inasmuch as a substantial part of the events or omissions giving rise to the claim occurred and caused injury to Plaintiff in the District of Columbia.

## III.    PARTIES

17.    Plaintiff Ambassador Gordon Sondland is a successful businessman who was appointed by President Trump to serve as the United States Ambassador to the European Union between July 9, 2018 and February 7, 2020.  Plaintiff is a resident of the State of Washington.

18.    Defendant Michael Pompeo served as the Seventieth Secretary of State of the United States from April 26, 2018 to the conclusion of the Trump Administration.  The Secretary of State is the head of the Department of State, the executive department responsible for carrying out Government foreign policy and international relations.  Upon information and belief, Pompeo is a resident of the State of Virginia.

IV.    **FACTS**

19.    Ambassador Sondland served as the United States Ambassador to the European Union for approximately one and a half years.  Ambassador Sondland's nomination received strong bipartisan support, and he was confirmed by the United States Senate by voice vote on July 8, 2018.  Prior to entering public service, Ambassador Sondland had been a Pacific Northwest-based entrepreneur and had served in a volunteer capacity in multiple government bodies, including as a board member of the Oregon Governor's Office of Film & Television under a Democratic governor and as a member of the Commission of White House Fellows under a Republican President.

20.    During his service as Ambassador, Ambassador Sondland resided in Brussels, Belgium, which is the de facto capital of the European Union and hosts most of its principal institutions.  The duties of his position required him to travel extensively within Europe, and he was frequently called to attend meetings in Washington, D.C.

21.    On September 24, 2019, the Speaker of the House announced the commencement of an impeachment inquiry into former President Trump.

22.    On September 25, 2019, Ambassador Sondland and Pompeo attended the eighteenth annual Transatlantic Dinner.  Ambassador Sondland was the only U.S. ambassador in attendance, which hosted the NATO Secretary General, the EU High Representative for Foreign and Security Policy, and foreign ministers from Europe and Canada.  During the dinner, Ambassador Sondland received an urgent phone call from The White House alerting him that his name appeared in a whistleblower complaint received by the Office of the White House Counsel.

23.     The following day, September 26, 2019, Ambassador Sondland and Pompeo met to discuss the whistleblower complaint with Ambassador Kurt Volker, United States Special Representative for Ukraine.  The same day, the United States House of Representatives Permanent Select Committee on Intelligence ("House Intelligence Committee") released the unclassified text of the whistleblower complaint.

24.     From this point onward, Ambassador Sondland was involuntarily drawn into the impeachment process.  Within days, Ambassador Sondland received a request to testify before the House Intelligence Committee, the House Committee on Oversight and Reform, and the House Committee on Foreign Affairs (collectively, the "House").  The format of the proposed testimony was a closed-door deposition scheduled for October 8, 2019.

25.     Although Ambassador Sondland was called to testify in his capacity as a United States Ambassador and a State Department employee, he was informed through his private counsel, Robert Luskin and Jim McDermott (hereinafter, with Paul Hastings, "Private Counsel"), that neither the State Department nor the U.S. Department of Justice would represent him.

26.     Ambassador Sondland therefore had no alternative:  He asked Private Counsel to represent him in connection with the building storm of Congressional interest in his testimony.

27.     In October 2019, after Ambassador Sondland learned he would not be provided the assistance of attorneys from the Government or allowed to use the assistance of his Ambassadorial staff, he scheduled a call with Pompeo.  During that call, Pompeo and the Government promised Ambassador Sondland that the Department of State, acting through the Secretary of State and in consultation with the Office of the White House Counsel, would reimburse Ambassador Sondland for all of his attorneys' fees and costs of Private Counsel in connection with the forthcoming Congressional proceedings (hereinafter, the "Indemnity Undertaking").  Ambassador Sondland's

Private Counsel heard Pompeo's promise, as they were listening to the call between Pompeo and Ambassador Sondland on a speaker phone.

28.    Ambassador Sondland's Private Counsel proceeded to prepare for the voluntary appearance scheduled for October 8, 2019, and Ambassador Sondland traveled from Brussels to Washington, D.C.

29.    Ambassador Sondland had no desire to testify and had no political agenda in this matter.  He understood that it was his legal obligation to provide testimony to a Congressional committee exercising its oversight and subpoena powers.  Absent contravening instruction from his employer (the State Department), Ambassador Sondland was advised that he had a legal obligation to testify.

30.    Early in the morning on October 8, 2019, the acting legal adviser to the Department of State instructed Ambassador Sondland not to appear for the previously scheduled appearance. Ambassador Sondland complied with the Government's orders and cancelled his October 8, 2019 appearance.  Acceding to the State Department's direction not to appear ratcheted up both the formality and adversarial tenor of further proceedings and, concomitantly, caused an increase in the attorneys' fees and costs of Private Counsel.

31.    Later that same day, the House served a subpoena upon Ambassador Sondland requiring his appearance and testimony in public proceedings.

32.    When consulted, neither the Department of State nor The White House offered any substantive guidance on how to respond to the subpoena.  Instead, both the acting legal adviser to the State Department and Deputy White House Counsel reiterated to Private Counsel that the Department of Justice could not represent Ambassador Sondland.  Ambassador Sondland inquired if he was given the same order not to appear in response to this subpoena as when the Department

8

of State did not allow him to voluntarily appear. When no one responded to Ambassador Sondland's inquiry, he appeared pursuant to the lawfully issued subpoena. He had no choice under the circumstances.

33. On October 16, 2019, Pompeo again reaffirmed that the Indemnity Undertaking was made with his knowledge and approval. Ambassador Sondland spoke with Pompeo via conference call from the Washington, D.C. office of his Private Counsel, who were also in attendance and listening on speakerphone. Pompeo promised without any qualification that the State Department would reimburse Ambassador Sondland the fees and costs of Private Counsel in full. Ambassador Sondland and his Private Counsel understood Pompeo to be stating that he had the authority to bind the Government to such an agreement. Ambassador Sondland relied on Pompeo's promise and reasonably believed that he had the authority to bind the Government to such an agreement. The Under Secretary for Management and the Counselor to the Secretary of State also confirmed that Ambassador Sondland would be reimbursed in full.

34. Ambassador Sondland took Pompeo's promise at his word and agreed to not further seek the use of Government attorneys for representation or assistance with the impeachment proceedings.

35. Per 22 U.S.C. § 2698, Pompeo is legally entitled to direct a principal officer of the Foreign Service, which includes all Ambassadors, to retain private legal counsel:

**§ 2698. Procurement of legal services**

> (a) The Secretary of State may, without regard to section 3106 of Title 5, authorize a principal officer of the Foreign Service to procure legal services whenever such services are required for the protection of the interests of the Government or to enable a member of the Service to carry on the member's work efficiently.

36. When Pompeo made this promise, he was acting within the course and scope of his duties as Secretary of State and with the authority of the Department of State. Alternatively, if he was *not* acting within the course and scope of his employment, he was acting in his own self-interest to protect himself and others and should be held personally and individually liable as set forth below.

37. On October 17, 2019, Ambassador Sondland testified under oath for nearly ten hours before the House in a closed-door hearing.

38. Ambassador Sondland prepared for his testimony with the assistance of Private Counsel, and he was represented by Private Counsel during his deposition in the closed-door hearing on October 17, 2019.

39. Ambassador Sondland's testimony included the "quid pro quo" alleged between the Administration and the newly elected Ukrainian government.

40. The impeachment inquiry advanced to a new phase in November, in which the House subpoenaed multiple witnesses to testify in public, televised hearings. Ambassador Sondland's testimony was scheduled for November 20.

41. As Ambassador Sondland prepared for a second round of testimony, the Department of State continued to restrict Ambassador Sondland's access to materials essential to his preparation. Ambassador Sondland testified in his opening statement to the House Committees on November 20:

> *I have not had access to all of my phone records, State Department emails, and other State Department documents. And I was told I could not work with my EU Staff to pull together the relevant files. Having access to the State Department materials would have been very helpful to me in trying to reconstruct with whom I spoke and met, when, and what was said.*

10

42.     Ambassador Sondland had more time to prepare for his November 20 open hearing. Additionally, in the weeks following his October 17 deposition, Ambassador Sondland had the benefit of reviewing the opening statements of several other civil servants who were called for private and public congressional testimony, including those of U.S. Ambassador to Ukraine William Taylor (deposed on Oct. 22) and National Security Council advisor Tim Morrison (deposed on Oct. 31).

43.     The statements of Ambassador Taylor and Mr. Morrison refreshed Ambassador Sondland's recollection of conversations that occurred in early September 2019; and in the interest of total truthfulness and candor, Ambassador Sondland decided to submit an amendment to his October 17 opening statement.  In this amendment, Ambassador Sondland clarified that he had told several individuals, including an adviser to Ukraine President Zelensky, that he speculated that the resumption of military aid to Ukraine—which had been suspended in July 2019—was conditioned on the Ukrainian government launching anticorruption investigations into the gas company Burisma and alleged Ukrainian interference in the 2016 U.S. election.  Hunter Biden, the son of President Joseph R. Biden, served on the board of directors of Burisma between 2014 and 2019.

44.     Prior to denying Ambassador Sondland legal fees or assistance preparing for his testimony, Ambassador Sondland had received only praise from Pompeo and the President. Ambassador Sondland worked well with his colleagues and was routinely complimented on his work, as contemporaneous documents show.  In fact, when Ambassador Sondland first learned he had been subpoenaed to testify, he was at The White House.  During a conversation with President Trump, Ambassador Sondland advised him about his forthcoming testimony.  The President responded, "go ahead and tell the truth."

45.     On the morning of November 20, 2019, Ambassador Sondland publicly testified before the House Intelligence Committee under oath for nearly seven hours.  As with his October 17, 2019 testimony, Ambassador Sondland had no desire to testify, but believed that it was his legal obligation to comply with the lawfully-issued subpoena to provide testimony to a Congressional committee exercising its lawful oversight powers.

46.     Ambassador Sondland confirmed his conclusion that the Administration sought a "quid pro quo" arrangement with the Ukrainian government.  Ambassador Sondland also testified concerning the resumption of suspended military aid to Ukraine.

47.     Ambassador Sondland testified he had personally informed senior Administration officials, including Vice President Pence and Pompeo, about efforts to work with Zelensky's administration to draft a statement announcing the anti-corruption investigations sought by the Administration.  Several emails between Pompeo and Ambassador Sondland were produced in support of this statement.  Ambassador Sondland told the investigating committees that the "State Department was fully supportive of our engagement in Ukraine affairs, and was aware that a commitment to investigations was among the issues we were pursuing."

48.     Two days later, on February 7, Ambassador Sondland met with the Counselor to the Department of State, who reaffirmed that the Indemnity Undertaking would be honored, and that the Government would reimburse Ambassador Sondland's legal expenses in full and referred him to the Ambassador to the Under Secretary of State for Management.  In a separate meeting that same day, the Under Secretary reaffirmed that the Indemnity Undertaking would be honored and that the Government would reimburse Ambassador Sondland's attorneys' fees and costs in full.

49.     During the meeting with the Counselor to the Department of State, Ambassador Sondland stated that he had no intention of leaving his position in the near future. Instead, Ambassador Sondland mentioned that he might consider stepping down in the summer of 2020 to return to lead his businesses, and he wanted to give his colleagues notice to permit a proper transition. In response, he was advised that while the Administration appreciated his testimony, the Administration wanted to purge everyone remotely connected to the Impeachment trial. Accordingly, the Counselor to the Department of State asked for Ambassador Sondland's resignation. In response, Ambassador Sondland said he would consider that proposal, but asked about his attorneys' fees. The Counselor to the Department of State told Ambassador Sondland to speak with the Under Secretary for Management, who would take care of his attorneys' fees. Later that day, Ambassador Sondland confirmed he would not resign because he did not do anything improper. After that, everything changed. Ambassador Sondland did not receive his attorneys' fees, notwithstanding the promises from the State Department that the attorneys' fees would be paid.

50.     Indeed, it was quickly made apparent that only false comfort could be taken from the assurances that his attorneys' fees and costs would be reimbursed.

51.     When Ambassador Sondland refused to resign, hours later on that same day, February 7, 2020, President Trump and Pompeo fired Ambassador Sondland.

52.     Since then, the Government has bobbed and weaved in the face of every attempt by Ambassador Sondland and Private Counsel to satisfy the Indemnity Undertaking.

53.     Attempts to renege on the Indemnity Undertaking began on March 3, 2020, when an Office of Legal Adviser Attorney informed Private Counsel that Ambassador Sondland would only be reimbursed $86,040. He explained that the number was calculated pursuant to the State

13

Department's official reimbursement policy, which was irrelevant to the case of Ambassador Sondland, who had been promised by Pompeo that he would receive full reimbursement from the Government.

54.    When Ambassador Sondland's employer denied him the services of Government counsel, in consideration for the promise that his fees would be reimbursed, Ambassador Sondland used experienced counsel to assist him with his testimony in the highest stakes of settings.  He used outside counsel in reliance on the promise and representation from Pompeo that the Government would reimburse him in full for all attorneys' fees and costs—a promise that the Government has since breached.

55.    Pompeo has acknowledged his promises since the impeachment trial of President Trump.  In June 2020, through counsel, Pompeo advised Plaintiff that, if he sent a letter explaining the allegations, the Government and Pompeo would ensure the payment of all attorneys' fees and costs incurred by Plaintiff.  Despite the letter being sent, nothing was resolved and no payment was made.

56.    As of the date of the filing of this Complaint, Ambassador Sondland has incurred legal fees of approximately $1,800,000.00 attributable to Private Counsel.  Private Counsel's legal fees have been paid in full.

57.    In the alternative, if Pompeo *now* alleges that he did not make his promise with the authority of the Government, Pompeo intentionally or negligently misrepresented that he had the authority to make this promise.  Pompeo did this for his own personal self-interest to benefit and protect himself and others, and was not acting in the course and scope of employment.

14

58. Ambassador Sondland has relied upon Pompeo's repeated assurances that he had the authority to bind the State Department to an agreement to reimburse Ambassador Sondland's attorneys' fee and costs from his Private Counsel and personal counsel.

59. When Pompeo intentionally or negligently misrepresented his authority to bind the Government, he was not acting in the course or scope of his official duties and was not subject to any governmental immunity. Indeed, Pompeo was making a promise that was not the type of act he was employed to perform, and which was not motivated by a desire to serve the Government. Instead, it was entirely for self-serving personal or political reasons in the hopes that Ambassador Sondland would not implicate him or others through his testimony.

60. Such rogue actions by Pompeo outside the course and scope of his employment were not isolated events. For example, on April 16, 2021, the Inspector General of the Department of State released a report detailing Pompeo's use of government employees for personal tasks for himself and his wife. These tasks—performed at taxpayer expense—included personal shopping and caring for Pompeo's dog. The report concluded that Pompeo and his wife, Susan, "made over 100 requests to employees in the office of the secretary to conduct work that appeared to be personal in nature."

61. Additionally, in August 2020, Pompeo spoke at the Republican National Convention in support of Trump's bid for reelection. Pompeo delivered this speech while supposedly on a diplomatic mission to Israel. He thereby used his office to further his personal political agenda.

15

62.     These actions ran afoul of the Hatch Act, which prohibits a federal employee form using his official position to influence the result of an election.  And violations of the Hatch Act are, by their nature, not within the course and scope of a federal government employee's employment.

## FIRST CAUSE OF ACTION

**(Breach of Contract Pursuant to Tucker Act,
28 U.S.C. § 1491 Against the U.S. Government)**

63.     Plaintiff incorporates paragraphs 1 through 62 as if fully set forth herein.

64.     Under the Tucker Act, the United States waives sovereign immunity for private claims founded on, inter alia, "express or implied contract[s] with the United States."   28 § 1491(a)(1).

65.     Defendant's repeated promises to reimburse Plaintiff completely for attorneys' fees and costs constitute either an express contract or an implied contract between Plaintiff and the Government under the Tucker Act.

66.     Pompeo represented that he had the authority to bind the Government; and, pursuant to 22 U.S.C. § 2698, Pompeo had actual authority to authorize a principal officer of the Foreign Service to procure legal services.

67.     In reliance upon Pompeo's promise, Plaintiff retained private counsel to represent him in his capacity as Ambassador; and Plaintiff incurred approximately $1.8 million in attorneys' fees in the course of his legal representation before Congressional committees.

68.     Despite promises by Defendants from 2019-2020 that Plaintiff would be reimbursed for all legal fees and costs, to this date, the Government has not reimbursed Plaintiff.

16

69. Plaintiff requests that the Court find the United States in breach of an express or implied contract and order the United States to reimburse the legal fees incurred by Plaintiff in reliance on Pompeo's promise.

**WHEREFORE**, Plaintiff respectfully prays that the following relief be granted: (i) that Plaintiff be awarded judgment in the sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00) or the amount proven at trial against the United States of America and Pompeo, individually, both jointly and severally pursuant to the factual allegations and law cited herein, inclusive of interest and costs recoverable by law; and (ii) award any other relief the Court deems proper and just.

<u>**SECOND CAUSE OF ACTION**</u>

**(Fraud: Intentional Misrepresentation Against Michael Pompeo Individually)**

70. Plaintiff incorporates paragraphs 1 through 69 as if fully set forth herein.

71. In the alternative, if Pompeo did ***not*** have the authority on behalf of the Government, Pompeo intentionally committed fraud against Plaintiff.

72. As set forth above, Pompeo repeatedly represented to Ambassador Sondland that he had the authority from the Government to bind the Department of State to a contract to reimburse Ambassador Sondland for his attorneys' fees and costs.

73. Pompeo made these representations for his own personal and political self-interest to personally benefit himself and others and was not acting in the course and scope of employment. Because he was acting on his own—in his individual capacity—Pompeo's actions are not subject to immunity.

74. Pompeo knew his material representations were false and intended them to be false in order to induce Plaintiff to comply with his instructions.

75.     Pompeo intended to, and did, induce Plaintiff into spending $1.8 million in attorneys' fees and costs.  Ambassador Sondland reasonably and justifiably relied upon Pompeo's misrepresentations.

76.     As a direct and proximate result of Pompeo's conduct, Plaintiff has suffered damages of $1.8 million, inclusive of interest and costs recoverable by law, or an amount to be proven at trial.

77.     The actions of Pompeo were accompanied by conduct and a state of mind evincing malice or its equivalent.  Pompeo acted with evil motive, actual malice, with intent to injure, or in willful disregard for the rights of Plaintiff.  Pompeo's conduct itself was outrageous, grossly fraudulent, or reckless toward Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays that the following relief be granted:  (i) that Plaintiff be awarded judgment in the sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00) or the amount proven at trial against the United States of America and Pompeo, individually, both jointly and severally pursuant to the factual allegations and law cited herein, inclusive of interest and costs recoverable by law; (ii) award punitive damages in an amount to be determined by this honorable Court; and (iii) award any other relief the Court deems proper and just.

### THIRD CAUSE OF ACTION

**(Negligent Misrepresentation Against Michael Pompeo Individually)**

78.     Plaintiff incorporates paragraphs 1 through 77 as if fully set forth herein.

79.     In the alternative, if Pompeo did ***not*** have the authority to bind the Government, Pompeo committed negligent representation.

80.     As set forth above, Pompeo repeatedly represented to Ambassador Sondland that he had the authority to bind the Government to a contract to reimburse Ambassador Sondland for his attorneys' fees.

81.     Pompeo made these representations for his own personal self-interest and political gain to benefit himself and others, without any basis for believing them to be true, and was not acting in the course and scope of his employment. Because he was acting on his own—in his own personal capacity—Pompeo's actions are not subject to immunity.

82.     Pompeo knew his representations were false and had no reasonable basis for believing them to be true.

83.     Pompeo intended to, and did, induce Plaintiff into incurring $1.8 million in attorneys' fees. Ambassador Sondland reasonably and justifiably relied on these misrepresentations. Had Plaintiff known that Pompeo did not have the authority to bind the State Department, he would not have incurred $1.8 million in attorneys' fees.

84.     As a direct and proximate result of Pompeo's conduct, Plaintiff has suffered damages of $1.8 million, inclusive of interest and costs recoverable by law, or an amount to be proven at trial.

85.     The actions of Pompeo were accompanied by conduct and a state of mind evincing malice or its equivalent. Pompeo acted with evil motive, actual malice, with intent to injure, or in willful disregard for the rights of Plaintiff. Pompeo's conduct itself was outrageous, grossly fraudulent, or reckless toward Plaintiff.

**WHEREFORE**, Plaintiff respectfully prays that the following relief be granted: (i) that Plaintiff be awarded judgment in the sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00) or the amount proven at trial against the United States of America and Pompeo,

19

individually, both jointly and severally pursuant to the factual allegations and law cited herein, inclusive of interest and costs recoverable by law; (ii) award punitive damages in an amount to be determined by this honorable Court; and (iii) award any other relief the Court deems proper and just.

## FOURTH CAUSE OF ACTION

### (Breach of Warranty of Authority Against Michael Pompeo Individually)

86.    Plaintiff incorporates paragraphs 1 through 85 as if fully set forth herein.

87.    In the alternative, if Pompeo did ***not*** have the authority to act on behalf of the Government, Pompeo committed a breach of warranty by falsely representing that he had such authority.

88.    Pompeo warranted to Plaintiff that he had the authority on behalf of the Government to enter into a contract to bind the Department of State to pay Ambassador Sondland's attorneys' fees and costs.

89.    Pompeo made these representations for his own self-interest to politically benefit himself and others and was not acting in the course and scope of employment when he made his warranties.  Pompeo's actions are not subject to immunity.

90.    Pompeo's actions were wanton, willful, and malicious, and misled Plaintiff into making the agreement, because Ambassador Sondland believed Pompeo had the authority to make the agreement and warranties at issue.

**WHEREFORE**, Plaintiff respectfully prays that the following relief be granted:  (i) that Plaintiff be awarded judgment in the sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00)or the amount proven at trial against the United States of America and Pompeo, individually, both jointly and severally pursuant to the factual allegations and law cited herein,

inclusive of interest and costs recoverable by law; (ii) award punitive damages in an amount to be

determined by this honorable Court; and (iii) award any other relief the Court deems proper and

just.

Respectfully submitted,

DATED:  May 24, 2021

MARK A. BARONDESS, Esq.
(DC Bar No. 391597)
Attorney for Plaintiff
**MILLER BARONDESS LLP**
1999 Avenue of the Stars
Suite 1000
Los Angeles, California 90067
Telephone:    (310) 552-4400
Facsimile:    (310) 552-8400
E-Mail:    mbarondess@millerbarondess.com

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on the issues set forth in this Complaint.

MARK A. BARONDESS, Esq.

21