## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| GORDON D. SONDLAND<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES OF AMERICA<br><br>    Defendant. | No. 21-2083C<br>(Judge Honorable Loren A. Smith) |

### PLAINTIFF'S TRIAL BRIEF

### I.    INTRODUCTION

Plaintiff Gordon D. Sondland ("Sondland" or "Ambassador Sondland"), a former United States Ambassador to the European Union, seeks to hold the Defendant, the United States Government ("Government") acting through former Secretary of State Michael R. Pompeo ("Pompeo" or "Secretary Pompeo") to its legally binding obligations. The context in which the legally binding obligations arose are critically important to understanding the obligations of the Government. In 2019, during the impeachment inquiry into President Trump, Ambassador Sondland was compelled to testify before Congressional committees in his capacity as a State Department employee in relation to a whistleblower complaint obtained by Congress. Ambassador Sondland was told that attorneys from the Government had been declared unavailable to advise or represent because of a conflict of interest. In a phone conversation with Pompeo, Ambassador Sondland explained his circumstances and proposed that he retain outside counsel. Pompeo unreservedly assured Ambassador Sondland that the Government would reimburse him for all of his legal fees and costs.

Thereafter, Ambassador Sondland prepared to testify in two sessions before the House Foreign Affairs and Intelligence and Oversight Committees on October 17 and November 20, 2019. Ambassador Sondland testified under oath for over seventeen hours, addressing concerns between President Trump's administration and the newly elected Ukrainian government leader, President Volodymyr Zelensky. His testimony was highly fraught, highly charged, and highly risky with tremendous consequences. Little did Ambassador Sondland know that testifying truthfully before Congress would become a fireable offense. Ambassador Sondland was terminated on February 7, 2020, for simply telling the truth. After Secretary Pompeo learned of Ambassador Sondland's testimony before Congress during the 2019 impeachment, Secretary Pompeo reneged on his promise. As a result, the Government has withheld fees and costs in breach of the October 2019 agreement between Secretary Pompeo on behalf of the Government and Ambassador Sondland. Ambassador Sondland now turns to this Court to make him whole.

## II.     FACTUAL BACKGROUND

### A.     The House Launches an Impeachment Inquiry into President Trump Based on a Whistleblower Complaint

The events at issue began on September 24, 2019, when former Speaker of the House of Representatives, Nancy Pelosi announced the commencement of an impeachment inquiry into President Trump. The impeachment inquiry was launched after Congress became aware of a whistleblower complaint by an intelligence official troubled by an alleged promise President Trump had made during a phone conversation with Ukrainian President Zelenskyy. One day after this announcement by Ms. Pelosi, Ambassador Sondland and then Secretary of State Michael Pompeo attended the eighteenth annual Transatlantic Dinner. During the dinner, Ambassador Sondland received an urgent phone call from The White House alerting him that his name appeared in a whistleblower complaint received by the Office of the White House Counsel. One day later,

on September 26, 2019, The House Intelligence Committee released the declassified whistleblower complaint to the public. The same day, Ambassador Sondland and Secretary Pompeo met to discuss the whistleblower complaint with Ambassador Kurt Volker, United States Special Representative for Ukraine.

      **B.**    **The House Committees Seek Ambassador Sondland's Testimony**

On September 27, 2019, the House Intelligence Committee, the House Committee on Oversight and Reform, and the House Committee on Foreign Affairs (collectively, the "House") all in charge of the impeachment inquiry against President Donald J. Trump made their first of several demands that Ambassador Sondland testify. The format of the proposed testimony was a closed-door deposition scheduled for October 8, 2019. Although Ambassador Sondland was called to testify in his capacity as a United States Ambassador and a State Department employee, he was advised through his private counsel, Robert Luskin, Kwame Manley, and Jim McDermott that neither the State Department nor the U.S. Department of Justice would represent him.

      **C.**    **October 3, 2019 Phone Call with Secretary Pompeo and Preparation for October 8 2019 Testimony**

On or about October 3, 2019 Ambassador Sondland made a phone call to Secretary Pompeo to explain the circumstances regarding the payment of legal fees for counsel to represent him during this closed-door deposition. On October 3, 2019, sitting in Paul Hastings Washington, DC offices with his aforementioned private counsel, Ambassador Sondland called Secretary Pompeo on speakerphone. Ambassador Sondland explained to Secretary Pompeo that he had been informed that neither the State Department nor the White House would provide counsel to represent him and that he would need to engage private counsel in order to prepare for his testimony, which would be extremely expensive. Secretary Pompeo actually laughed and told Ambassador Sondland he was fully aware of how much private counsel costs. Secretary Pompeo,

presumably to put Ambassador Sondland's mind at ease over his expected testimony, *unequivocally promised that the Government would pay for his legal fees* (hereinafter, the "Indemnity Undertaking"). Ambassador Sondland took Pompeo's promise at his word and agreed to not further seek the use of Government attorneys for representation or assistance with the impeachment proceedings.

With the issue of his legal fees resolved, Ambassador Sondland, private counsel proceeded to prepare for his voluntary appearance scheduled for October 8, 2019, and traveled from Brussels to Washington, D.C. In the early morning hours of October 8, 2019, Ambassador Sondland was in his final preparation for his testimony before the House and on his way to Capitol Hill when his counsel received a communication from the acting legal adviser to the Department of State instructing Ambassador Sondland not to appear. Ambassador Sondland complied with the Government's orders and cancelled his October 8, 2019 appearance. Acceding to the State Department's instruction for him not to appear ratcheted up both the formality and adversarial tenor of further proceedings and, concomitantly, caused an increase in the attorneys' fees and costs of Sondland's legal fees and costs.

### D.   Ambassador Sondland is Subpoenaed and Testifies Before Congress

After refusing to appear for a voluntary deposition on October 8, 2019 at the instruction of the State Department, the House then served a subpoena upon Ambassador Sondland the same day requiring his appearance and testimony on October 17, 2019. His private counsel consulted both the Department of State and The White House, but neither offered any substantive guidance on how to respond to the subpoena.[1] Ambassador Sondland inquired if he was given the same order

---

[1]   In a happenstance conversation with President Trump at The White House in advance of Ambassador Sondland's testimony, President Trump told the Ambassador that he should testify and should do so truthfully. That is exactly what Ambassador Sondland did. President Trump did not attempt to influence Ambassador Sondland's testimony in any manner.

not to appear in response to this subpoena as when the Department of State did not allow him to voluntarily appear. When no one responded to Ambassador Sondland's inquiry, he prepared to appear before the House pursuant to the lawfully issued subpoena.

On October 17, 2019, Ambassador Sondland testified under oath for nearly ten hours before the House in a closed-door hearing.[i] As was discussed with Secretary Pompeo as part of the Indemnity Undertaking, Ambassador Sondland prepared for his testimony with the assistance of his private counsel, and he was represented by them during his deposition.

The impeachment inquiry advanced to a new phase in November 2019, in which the House subpoenaed multiple witnesses to testify in public, televised hearings. Ambassador Sondland had more time to prepare for his November 20 open hearing. He had the benefit of reviewing the opening statements of several other civil servants who were called for private and public congressional testimony, including those of U.S. Ambassador to Ukraine William Taylor (deposed on Oct. 22) and National Security Council advisor Tim Morrison (deposed on Oct. 31). Accordingly, Ambassador Sondland submitted an amendment to his October 17 opening statement. In this amendment, Ambassador Sondland clarified that he had told several Ukrainian officials, including an adviser to President Zelensky, that he only speculated that the resumption of military aid to Ukraine, which had been suspended in July 2019, was conditioned on the Ukrainian government launching anticorruption investigations into the gas company Burisma and alleged Ukrainian interference in the 2016 U.S. election. Hunter Biden, the son of former President Joseph R. Biden, served on the board of directors of Burisma between 2014 and 2019.

On the morning of November 20, 2019, Ambassador Sondland publicly testified before the House Intelligence Committee under oath for nearly seven hours. Ambassador Sondland confirmed that according to information provided to him, Ambassador Volker and Secretary Perry

714644                                                    5

by Rudy Guiliani, the President's personal lawyer, that President Trump wanted the Ukrainian government to reinstate the fraud investigations, including those pertaining to Burisma, and that upon President Zelensky announcing that he would do so, that he would receive an invitation to The White House. Ambassador Sondland's testimony regarding a "*quid pro quo*" related to that.

### E.     Request for Resignation, Termination and Breach of Promise

Between November 2019 and February 2020, both Ambassador Sondland and his private counsel sought reimbursement for attorneys' fees and costs accrued in connection with preparing him to testify before the House per the Indemnity Undertaking. Ambassador Sondland submitted the legal invoices and other requested information to the State Department with no response. On January 28, 2020, Ambassador Sondland emailed the Counselor to the Department of State Ulrich Brechbuhl expressing his concern that he had yet to be fully reimbursed by the State Department. Several days later, on February 6, Ambassador Sondland met with Mr. Brechbuhl in Washington D.C. Brechbuhl advised that while the Administration appreciated his testimony, the Administration wanted to purge everyone remotely connected to the Impeachment trial. Accordingly, the Brechbuhl asked for Ambassador Sondland's resignation. At that time, Brechbuhl also reaffirmed the Indemnity Undertaking and stated that the State Department would fully reimburse Ambassador Sondland for attorneys' fees and costs he accrued in connection with his testimony. Ambassador Sondland expressed to Brechbuhl that he had no intention of leaving his position soon. Instead, Ambassador Sondland mentioned that he might consider stepping down in the summer of 2020 to return to lead his businesses, and he wanted to give his colleagues notice to permit a proper transition. Ambassador Sondland informed Brechbuhl that he would need to think about this proposal. The same day, Ambassador Sondland met with the Undersecretary of State, Brian Bulatao, who also reaffirmed the Government's promise to pay for Mr. Sondland's

attorneys' fees and costs in full.

What Ambassador Sondland did not know was that the State Department's unequivocal promise to pay for his attorneys' fees and costs was now being conditioned on him resigning. When Ambassador Sondland refused to resign, hours later that same day, February 7, 2020, President Trump and Pompeo fired Ambassador Sondland. Ambassador Sondland reached out to Mr. Bulatao in late February 2020 to express his regret that his private counsel and the State Department could not reach a mutually beneficial resignation and to reaffirm that the State Department would still reimburse him in full for the attorneys' fees and costs accrued in connection with his testimony before the House. After the State Department's silence on this matter, it was quickly made apparent that only false comfort could be taken from the assurances that his attorneys' fees and costs would be reimbursed.

Attempts to renege on the Indemnity Undertaking began on March 3, 2020, when an Office of Legal Adviser Attorney informed Private Counsel that Ambassador Sondland would only be reimbursed $86,040. He explained that the number was calculated pursuant to the State Department's reimbursement policy, which was irrelevant to the case of Ambassador Sondland, who had been promised by Secretary Pompeo that he would receive full reimbursement from the Government. Pompeo has acknowledged his promises since the impeachment trial of President Trump. In June 2020, through counsel, Pompeo advised Ambassador Sondland that, if he sent a letter explaining the allegations, the Government and Pompeo would ensure the payment of all attorneys' fees and costs incurred by Plaintiff. Despite the letter being sent, nothing was resolved, and no payment was made.

### III. <u>ARGUMENT</u>

The Government's promise to reimburse Ambassador Sondland completely for attorneys' fees and costs constitute an express contract or an implied contract between Ambassador Sondland and the Government under the Tucker Act.

To recover for a breach of contract against the federal government, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising under the contract, (3) a breach of that duty, and (4) damages caused by the breach. *San Carlos Irrigation & Draining Dist. v. U.S.*, 877 F.2d 957, 959 (Fed. Cir. 1989). To establish a valid contract with the government, a party must allege and establish: (1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in the offer and acceptance and (4) that the government official whose conduct the promisee relies upon has actual authority to bind the government in contract. *Anderson v. United States*, 344 F.3d 1343, 1353 (Fed. Cir. 2003). As explained herein, the Indemnity Undertaking was a valid contract.

#### A. <u>Secretary Pompeo Made an Offer to Ambassador Sondland</u>

Secretary Pompeo, acting within the admitted course and scope of his duties as Secretary of State and with the authority of the Department of State as confirmed by the Westfall Declaration previously filed[2], made an unambiguous offer and promise to pay for the attorneys' fees and costs Ambassador Sondland would incur complying with the Congressional request for his testimony. To prove mutuality of intent, a Plaintiff must, by objective evidence, show that one party to the contract extended an offer and then that the other party accepted that offer. *Anderson*, 344 F.3d at 1353. An offer is made by the "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude

---

[2] *See* Westfall Certification dated July 13, 2021, filed by the Defendant in *Gordon Sondland v. United States of America*, et al., Civil Action No. 21-1405 (RJL) in the United States Court for the District of Columbia.

it." *Am. Fed. Bank, FSB v. U.S.*, 58 Fed. Cl. 429, 436-37 (2003).

Ambassador Sondland did understand Secretary Pompeo to be making him an offer and an unequivocal promise. After telling Secretary Pompeo that he understood that neither the State Department nor the U.S. Department of Justice would represent him, Sondland suggested that his private counsel represent him in connection with responding to the Congressional request for his testimony but expressed concerns about the expense and reimbursement. Secretary Pompeo sought to put Ambassador Sondland's mind at ease when he offered, on behalf of the government, to reimburse Sondland for his legal fees. His offer was unequivocal based on the recollection of Mr. Sondland, and his three esteemed private counsel who were listening to the conversation on speaker phone. At the time this offer and promise was made, Ambassador Sondland did not have any legal obligation to testify before the Congressional committee. He determined that it would be in the best interest of the State Department, given that he was testifying in his capacity as Ambassador, if he were represented by counsel.

> **B.**     **Upon Accepting Secretary Pompeo's Offer, Ambassador Sondland Prepared with Private Counsel to Testify**

Ambassador Sondland objectively manifested his assent by his conduct in performing exactly in accordance with the offer. Once an offer is made, the offeree possesses the power of acceptance and can bring the contract into existence by accepting the offer. *Frankel v. United States*, 118 Fed. Cl. 332, 335 (2014) (noting that "[t]he offer by one party of specified compensation for the performance of a certain act to any or all persons who may accept and comply with its conditions constitutes a promise by the offeror, and the performance of that act is the consideration for the promise. The result is an enforceable contract."); *see also* 7 Williston on Contracts § 17:6 (4th ed. 2014). He began working with his private counsel almost immediately

714644                                                9

to prepare for his sought testimony, as discussed with Secretary Pompeo during their phone call on October 3, 2019. If there was any lingering uncertainty on the Government's part as to whether Sondland accepted Pompeo's offer, his counsel's email the following day memorializing this conversation and the Indemnity Undertaking would have put that uncertainty to rest. Accordingly, Mr. Sondland's acceptance of Mr. Pompeo's offer was clear and absolutely unambiguous.

### C. The Indemnity Undertaking Was Supported by Consideration

The agreement between Secretary Pompeo and Ambassador Sondland was supported by valid consideration, meeting the stringent requirements for government contracts established by the Federal Circuit. In government contract cases, consideration requires a clear bargained-for exchange where each party receives a benefit or incurs a detriment. *Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1574 (Fed. Cir. 1991); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000) (maintaining that government contracts require "consideration to ensure mutuality of obligation").

The consideration in this case was substantial and flowed in both directions. The Government received significant benefits, including: (1) ensuring professional representation of its senior diplomat during Congressional testimony on matters of national importance, (2) maintaining possible control over the testimony process through coordination with private counsel, and (3) protecting State Department interests during a highly sensitive political investigation. *See*, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008) (recognizing governmental benefits as valid consideration); *Gardiner, Kamya, & Assocs., P.C. v. Jackson*, 369 F.3d 1318, 1320 (Fed. Cir. 2004) (finding valid consideration based on the substantial benefit the government received from contractor's performance).

Secretary Pompeo agreed to reimburse Sondland for the attorneys' fees and costs accrued in preparing for this testimony.  Ambassador Sondland, in turn, provided consideration through both performance and detriment: (1) incurring approximately $1,505,960[3] in legal fees and costs in reliance on the government's promise, (2) foregoing other potential representation options, and (3) complying with State Department directives regarding his testimony. The Supreme Court has consistently held that such detrimental reliance constitutes valid consideration. *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 608 (2000); *Hendrick v. Lindsay*, 93 U.S. 143, 148 (1876). The Federal Circuit has specifically recognized that a party's reliance on a government promise, resulting in economic detriment, valid. *Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  Here, Ambassador Sondland's substantial economic detriment, incurred in direct reliance on Secretary Pompeo's promise on behalf of the Government, provides particularly strong consideration. *See Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1357 (Fed. Cir. 2009) (affirming that substantial economic commitments made in reliance on government promises constitute consideration).

The Federal Circuit has established that consideration in government contracts must be analyzed based on the specific circumstances of each case, with particular attention to whether the private party reasonably relied on the government to their detriment. *Anchorage v. United States*, 148 Fed. Cl. 338, 346 (Fed. Cir. 2020).  Here, Ambassador Sondland's reliance on Secretary Pompeo's promise materially altered his position and limited his available options. The Court of Federal Claims has recognized that when a party changes their position based on a government promise, this constitutes valid consideration. *Lublin v. United States*, 4 Fed. Cl. 678, 682 n.7

---

[3]     Ambassador Sondland's legal fees and costs totaled $1,792,000. Of that amount, the State Department insurance policy (which the Ambassador personally purchased) promptly paid the $200,000 policy limit in late 2019. Of the remaining balance of $1,592,000, the State Department only reimbursed an additional $86,040. Thus, Ambassador Sondland was forced to pay the remaining balance of $1,505,960.

(2008) (noting that consideration need not take the form of specific property susceptible of valuation, but constitutes, more broadly, "any performance which is bargained for"). Ambassador Sondland could have pursued multiple alternative courses of action: He could have foregone counsel entirely; continued seeking representation from government attorneys; retained less expensive counsel; or declined to follow the State Department's instructions regarding his Congressional appearance. Instead, relying on Secretary Pompeo's explicit promise on behalf of the Government, he retained experienced private counsel and fully cooperated with the State Department's directives, incurring substantial costs he would not have otherwise faced. This type of detrimental reliance has been specifically recognized as valid consideration in government contract cases. *See Davis Wetlands Bank, LLC v. United States*, 114 Fed. Cl. 113, 121 (2013) (finding consideration where contractor relied on government promise and incurred expenses as a result); *Anchor Tank Lines, LLC v. United States*, 127 Fed. Cl. 484, 494 (2016) (same).

The House prevented State Department counsel from participating in the depositions of current and former Department officials. So, Ambassador Sondland, with the Government's full knowledge and approval by Secretary Pompeo, enlisted the assistance of his private counsel, a Washington, D.C. law firm very well experienced in Congressional investigations that possessed the capacity to assist him. Throughout the process of preparing for the hearing, Ambassador Sondland's private counsel were in constant communication with the legal advisor to the State Department and the Deputy White House Counsel. Ambassador Sondland did not have a personal desire to testify in these impeachment proceedings and had no political agenda regarding these matters. Ambassador Sondland had always enjoyed a positive relationship with President Trump and Secretary Pompeo and always fully supported the Trump administration agenda. Mr. Sondland could have given put little time and effort in his preparation to appear before Congress in his

capacity as a State Department employee, likely to the detriment of the State Department. But instead, Mr. Sondland, to his detriment, prepared with qualified counsel and cooperated with State Department instructions related to his sought testimony.

### D. Mr. Pompeo Had The Authority to Bind the Government to a Contract with Ambassador Sondland

At the time of the Indemnity Undertaking, Secretary Pompeo was acting within the admitted course and scope of his duties as Secretary of State and with the authority of the Department of State as confirmed by the Government's Westfall declaration.[4] Government officials have express actual authority to bind the government in contract when such authority is unambiguously granted by the Constitution, a regulation, or a statute. *Vargas v. United States*, 114 Fed. Cl. 226, 234 (2014). Per 22 U.S.C. § 2698, Pompeo is legally entitled to direct a principal officer of the Foreign Service, which includes all Ambassadors, to retain private legal counsel.

> § 2698. Procurement of legal services (a) The Secretary of State may, without regard to section 3106 of Title 5, authorize a principal officer of the Foreign Service to procure legal services whenever such services are required for the protection of the interests of the Government or to enable a member of the Service to carry on the member's work efficiently.

Pompeo represented that he had the authority to bind the Government; and, pursuant to 22 U.S.C. § 2698, Pompeo had actual authority to authorize Sondland to procure legal services and bind the Government to pay for such services when required for the protection of governmental interests or to enable efficient performance of official duties.

---

[4] Brian P. Hudak, Acting Chief of the Civil Division of the United States Attorney's Office stated in pertinent part "[I] have read the complaint in the above-captioned action, and on the basis of information currently available to me with respect to the incidents alleged therein, I find that Michael R. Pompeo was acting within the scope of hos employment as an officer or employee of the United States of America at the time of the alleged incidents." The alleged incidents are identical to the allegations contained in the First Amended Complaint filed in the instant action.

714644                                    13

### E. The Government Breached Its Duty to Pay Plaintiffs' Attorneys' Fees and Costs

The Government materially breached its contract with Ambassador Sondland. Despite affirmations by Secretary Pompeo, then Counselor to the Department of State, Mr. Brechbuhl, and then Undersecretary Bulatao that the Government would fulfill its duty to pay for Ambassador Sondland's attorneys' fees and costs under the Indemnity Undertaking, to date, no payment has been made. "A breach is material when it relates to a matter of vital importance or goes to the essence of the contract." *D'Andrea Brothers LLC v. United States*, 109 Fed. Cl. 243, 261 (2013). Whether a particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1312 (Fed.Cir.2004) (quoting *Stone Forest Indus. Inc. v. United States*, 973 F.2d 1548, 1551 (Fed.Cir.1992)).

Ambassador Sondland's substantial reliance on the Indemnity Undertaking constituted valid consideration under well-established Federal Circuit precedent. *See Aviation Contractor Employees, Inc. v. United States*, 945 F.2d 1568, 1573 (Fed. Cir. 1991) (holding that detrimental reliance can constitute consideration in government contracts). Ambassador Sondland provided consideration by relying on the Indemnity Undertaking to his detriment when he incurred $1,505,960 in attorneys' fees and costs during his legal representation before Congressional committees, while also providing valuable testimony that served the Government's interests in transparency and oversight. The Government materially breached its reciprocal duty under the Indemnity Undertaking when it failed to reimburse these substantial fees and costs, despite receiving the benefit of Ambassador Sondland's cooperation and testimony.

F. **Plaintiff Seeks Relief to Make Him Whole**

As a direct result of the Government's breach of the Indemnity Undertaking, Ambassador Sondland has been damaged by $1,505,960. Breach of contract damages are "recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

The damages were not only reasonably foreseeable but were specifically contemplated by the Government at the time of contracting. The very purpose of the Indemnity Undertaking was to cover Ambassador Sondland's attorneys' fees and costs, and Secretary Pompeo explicitly acknowledged and agreed to this obligation.. And Ambassador Sondland paid these costs in full to his detriment. He used outside counsel in reliance on the promise and representation from Secretary Pompeo that the Government would reimburse him in full for all attorneys' fees and costs – a promise that the Government has since breached. The amount of damage is reasonably certain. Private counsel has already been paid in full in relation to their representation of Ambassador Sondland before the Congressional committees. The legal invoices from private counsel have been produced to the Government in this case as well as the evidence of payment by Ambassador Sondland.

Accordingly, under established precedent regarding government indemnification agreements, (*See United States v. Winstar Corp*., 518 U.S. 839 (1996)), and following the well-settled principle that breach of contract damages should place the non-breaching party in as good a position as if the contract had been performed, Ambassador Sondland is entitled to recover $1,505,960 in legal fees and costs he incurred as a direct and proximate result of the Government's

breach of the Indemnity Undertaking.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff and the Government had a valid and enforceable contract under well-established principles of federal contract law, as articulated in *Hercules v. United States*, 516 U.S. 417 (1996) and *Trauma Service Group v. United States*, 104 F.3d 1321 (Fed. Cir. 1997). The Indemnity Undertaking meets all essential elements of contract formation - offer, acceptance, and consideration - and was executed within the scope of the Government's authority. Accordingly, the Plaintiff respectfully requests that this Court: (i) grant relief in the sum of $1,505,960 against the United States, representing reasonable attorneys' fees and costs directly resulting from the Government's breach of the Indemnity Undertaking and (ii) award any other relief the Court deems proper and just.

|  |  |
|---|---|
| January 28, 2025 | Respectfully submitted, |
|  | _____ |
|  | Mark A. Barondess, Esq. |
|  | MILLER BARONDESS, LLP |
|  | 2121 Avenue of the Stars, Suite 2600 |
|  | Los Angeles, California 90067 |
|  | Telephone: (310) 552-4400 |
|  | Facsimile: (310) 552-8400 |
|  |  |
|  | Attorneys for GORDON D. SONDLAND |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of January, 2025, I electronically filed the foregoing **PLAINTIFF'S TRIAL BRIEF** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

BRIAN M. BOYNTON  
Principal Deputy Assistant Attorney General

Attorneys for:  
THE UNITED STATES OF AMERICA

PATRICIA M. McCARTHY  
Director

STEVEN J. GILLINGHAM  
Assistant Director

WILLIAM J. GRIMALDI  
Assistant Director  
Email: william.j.grimaldi@usdoj.gov

GEOFFREY M. LONG  
Senior Trial Counsel  
Email: Geoffrey.M.Long@usdoj.gov

JOSHUA W. MOORE  
Trial Attorney  
Email: Joshua.W.Moore@usdoj.gov

Commercial Litigation Branch  
Civil Division, Department of Justice  
P.O. Box 480  
Ben Franklin Station  
Washington, D.C. 20044  
Telephone: (202) 616-0471  
Email: william.j.grimaldi@usdoj.gov

Respectfully Submitted,

_____  
MARK A. BARONDESS (DC Bar No. 391597)  
Attorney for Plaintiff  
MILLER BARONDESS LLP  
2121 Avenue of the Stars, 26th Floor  
Los Angeles, California 90067  
Telephone: (310) 552-4400; Fax: (310) 552-8400  
Email: mbarondess@millerbarondess.com